Freddie D. **ROBINSON** et al., Plaintiffs,

v.

**UNION CARBIDE CORPORATION, MATERIALS SYSTEMS DIVISION,**
Defendant.

**Civ. A. No. 7583–73–H.**

United States District Court,
S. D. Alabama, S. D.

Aug. 29, 1974.

J. U. Blacksher, of Crawford & Blacksher, and Caryl P. Privett, Mobile, Ala., for plaintiffs.

Vincent McAlister, of Almon, McAlister & Ashe, Sheffield, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, District Judge.

This cause originated in this Court on March 15, 1973 when plaintiffs, Freddie

D. Robinson, Thomas S. Austin, Jr., Willie L. Jones, Olney W. Lucious, III, Willie J. Mickles, Peter Reese, Jr., Paul Richardson, Cynthia Caldwell, Jerome G. Fitts and Ronald L. Coleman filed this action on their own behalf and on behalf of all other persons similarly situated, pursuant to Federal Rules of Civil Procedure, Rule 23, to secure protection and to redress deprivation of rights secured by Title 42, U.S.C., Section 2000e et seq. and Title 42, U.S.C., Section 1981.

By Order of the Court on the 7th day of January, 1974, the Court held this cause was proper for a class action and the class was defined as:

"Those black job applicants who had an outstanding job application at the time of the commencement of this cause and those black job applicants who have filed job applications since the commencement of this cause and all future black job applicants, along with all current black employees of defendant, Union Carbide Corporation, Materials Systems Division."

After extensive discovery, a Pretrial Conference was held wherein the questions to be determined by the hearing were delineated. Though these triable issues were reduced to five in number covering a fairly wide range of alleged discriminatory practices, the main point advanced throughout the entire course of this litigation, both in arguments on motions, in conference, and upon the trial itself, was the expressed desire of the plaintiffs' counsel, through the aegis of this class action, to establish a new requirement of law, to become applicable nationwide, relative to the hiring practices of industry as they deal with minority employment problems; viz., whether or not the rule established, or fastly becoming so, that industry must demonstrate a ratio (quota) of minority to majority employees commensurate with that in the labor market available, failing in which there is prima facie discrimination, is the appropriate rule, or whether or not the better rule would be

that the employment ratios (quotas) must equal the application ratios. Translated to the case at hand, it was argued that where it is shown that as to the hourly rate employees, 26 percent were black and 74 percent were white, closely paralleling the work force ratio in the Mobile area, there was invidious discrimination being practiced by the employer because the application ratio was more nearly 50–50, and unless the employment practices were or are such as to accomplish this ratio in employment, it is prima facie that the employer is practicing racial discrimination.

Where counsel may now urge strongly the other points raised, this Court was pressed over and over again that the application ratio to hiring was what counsel desired to establish by this action; therefore, this was the desired relief sought by the class.

This record also shows, with unabashed frankness, the limits employed by the plaintiffs representative in utilizing the courts to establish pet theories. In the not too distant past it was considered by law schools, the Courts, and the legal profession as a whole that solicitation of litigation was unethical. One of the reasons advanced for this "growing more antiquated" theory was that the law favored compromise, not the stirring up of controversy.[1] In this instance, the Legal Defense Fund sent runners, now called "investigators", into this area to determine the conditions of employment in various industries and to seek out and encourage those who were reluctant to participate by representing to them that it would cost them no dollars to do so, either by way of attorneys fees or in expenses, and might result in dollars in their pockets if successful. Those who could be so persuaded were referred to associate counsel who would then undertake to represent them in this endeavor.

Though there are viable theories and approaches to the redress of grievances in this type situation sanctioned by his-

---

1. One would assume from the Judeo-Christian theory of "Blessed are the peacemakers".

toric experience, the modern art of the law is set to encourage solicitation of business by clothing the "solicitors" with the grand name of "private attorneys general" whose duty it is to encourage controversy and to seek out and redress wrong.[2] What perfidy.

Again translated to the case at hand, we have an industry whose number of minority hourly employees is in proportion to the available labor force, yet they are sued to establish a new concept of what the law should require, as conceived by some pronouncement from a shrouded Olympus, and to be wrought from the courts by the solicitation of a clientele as a needed vehicle. Again we lament, there is obliged to be a better solution to establish a new law than by legislative and/or court sanction of the destruction of the high quality of the legal profession. What tragedy that lawyers and the courts allow themselves to be used in transforming the legal profession from that of a true profession to that of a business. It is indeed with sad heart that we bid a fond farewell to what was once the legal definition of the words "champerty" and "barratry".

Having departed this island of legal ethic, let us travel on to our next port of call. The Bible makes mention of the visitation of the sins of the fathers to the children, even to the seventh generation. Once there was a time when it was entirely permissable to ride a horse down the main thoroughfare. Today it might arguably be said that to do so would obstruct traffic, therefore it is illegal. Having determined that it is illegal, we must now go back and punish all of those who ever rode horses down the street. Idiotic analogy? Of course, but it is not too far from the mark of apparent present day philosophy when considering laws affecting race relations.

Reference here is to the retroactive effect given the "penalty" phase of the present state of the law which imposes on this generation the past deeds of our forefathers. "Penalty" is probably too harsh a term—it is studiously avoided —"reparations" may be a more apt or "in" term.[3] When James Foreman

---

2. Code of Ethics, Alabama State Bar Association, December 14, 1887:
 "DISREPUTABLE TO STIR UP LITIGATION.
 "20. It is indecent to hunt up defects in titles and the like and inform thereof, in order to be employed to bring suit; or to seek out a person supposed to have a cause of action, and endeavor to get a fee to litigate about it. Except where ties of blood, relationship or trust, make it an attorney's duty, it is unprofessional to volunteer advice to bring a law suit. Stirring up strife and litigation is forbidden by law, and disreputable in morals."
 Canons of Professional Ethics of the American Bar Association:
 "28. STIRRING UP LITIGATION, DIRECTLY OR THROUGH AGENTS.
 "It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the Bar having knowledge of such practices upon the part of any practioner immediately to inform thereof, to the end that the offender may be disbared."
 "42. EXPENSES OF LITIGATION.
 "A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."
 See annotation 139 A.L.R. 620.

3. A rose by any other name smells as sweet.

preached from the pulpits that the black man was entitled to five hundred million dollars in reparations from the white man the idea was considered shocking. Measured by the ultimate cost to present day industry and thus the public generally, the end result of the present direction of court decrees can only be translated into a burden on this generation that will far surpass the wildest imaginings of Mr. Foreman. Legislation or court decree directed in an effort to correct past policies of discrimination is highly desirable, for all men must stand equal before the law, but if too high a cost is placed upon this effort, history teaches that it will have less chance of ultimate success for, right or wrong, life seems to be a matter of economics even where morals are concerned.

The law has recognized this axiom in another way. An example is to be found in tort law where evidence of subsequent correction cannot be introduced to prove past defalcations. The theory is that if such were not the law man would not correct his past errors.

In the realm of "reparations" the courts themselves have recognized the extreme difficulty in adopting a rule by which past defaults are to be compensated. Indeed as one court has said: " * * * the * * * effects of discriminatory practices * * * continued over an extended period of time calls forth the quagmire of hypothetical judgment discussed earlier * * *. It should be emphasized that this is not a choice between one approach more precise than another. Any method is simply a process of conjectures. * * * " So, to award "penalties", or "reparations" if you please, we now resort to speculation, conjecture and surmise.

It is disturbing, also, that the doctrine of "good faith" is to be abandoned when the question of "reparations" are in issue. The reasoning advanced to cover this abandonment of principal is that back pay awards are to "compensate for economic loss" and "not as punishment for past discrimination or as a prod to further compliance". Such thin-veiled distinction in an effort to avoid the use of the term "penalty" cries out for the forthright approach if we are to express true intellectual honesty.

Where manipulatable statistics invariably cast the burden upon the defendant to exonerate himself of guilt, where guidelines affecting employment practices are established by government agency that are so stringent that no industry has successfully met the burden of their requirements to the satisfaction of the courts (testing), where good faith efforts to comply with the change in the law are not to be considered, and where the substantial burden or "maximum burden" is placed on the defendant on proof of loss of back wages, calling the result an award for "economic loss" does not change its true character from that of "penalty". This is particularly true where past acts had the sanction of law or custom at the time.

Thus departing these murky shores we cast a weather eye to the next island in the archipelago. This misty isle has a towering peak that comes and goes through the fog of legal definition. We address ourselves to what may otherwise be defined as "quotas" and which is apparently so hideous to view that the courts have tried to hide it with a fog of legal jargon that only lightly veils the outlines of the summit.

42 U.S.C., Section 2000e–2(j) provides in pertinent part:

Nothing contained in this subchapter shall be interpreted to require any employer . . . subject to this subchapter (Title VII) to grant preferential treatment to any individual or to any group . . . or (to require employers to employ) in comparison with the total number or percentage of persons of such race . . . in any community, State, section or other area . . .

Executive Orders number 4 and 11246, originally signed by President Johnson but later revised by the Department of Labor, require institutions to give pref-

erential treatment to minorities in hiring and promotion practices and require that goals and timetables be filed annually by each affected employer. These Orders cover about 95 percent of the employment market. The power of government in its direct employment policy and in its ability, through indirect means, to coerce those doing business with it in their employment policies have, through these Executive Orders, all but subverted the wording of the aforementioned section. Though it is insisted that "you never have to hire any unqualified person" or "obtain any set number of employees of a given race", government has required that affirmative action policies be established which must reflect active programs to accomplish the employment of minority groups to specified levels, failing in which economic pressures and sanctions are imposed as punishment sometimes consisting of loss of contracts, etc.

In a recent interview carried in the New York Times Magazine section, Archibald Cox expressed himself very forcefully on the proposition that the "end" does not always justify the "means". The logic expressed in that article was quite sound and applies with full vigor to solutions of problems involving race relations. Most often, success in meeting affirmative action programs established pursuant to government prodding or, as in the case of the industry under present consideration by this litigation, voluntarily, is almost universally measured by a showing of the proper proportion of minority to majority hires. Called what you want, this translates into "quotas". (It must be considered a breath of fresh air sweeping up the face of the mountain and dissipating the fog when the appellate court of this Circuit acknowledges in unvarnished terms the requirement of quotas until past practices of invidious discrimination are finally dissipated.)

Though here again there are viable alternatives to the imposition of "quotas" in an effort to secure compliance with the non-discrimination policies of government, we are fast becoming grounded on the premise that this society, once priding itself as being the melting pot of all classes and kinds, is very distinctly a class conscious society that must be proportionately represented in all areas of endeavor. It would do no good to explore alternatives for we are well beyond the point of these considerations, but do let us stop and examine the danger attendant with the philosophy advanced by plaintiffs' counsel through this class action, for it seizes upon the art and kicks it a long way up the slope.

What now fixes the "quota"? The implication of present decision law is that if industry employs blacks below the ratio of minority to majority in the area work force it is prima facie evidence of discrimination. As affecting the industry involved in this case, the evidence is that the hourly employees meet the quota as established by this ratio. However, the ratio of applicants more nearly approximates 50–50, which is considerably higher than the ratio of minority to majority in the work force, ergo, this industry discriminates. This is so because these statistics, as in other cases, show a prima facie case of discrimination and therefore the burden shifts to the industry to prove that it has some justifiable business purpose why the employment ratio ought not to be 50–50. Advancing the same argument to its ultimate conclusion, you can envision a situation where the number of applications were maneuvered to or legitimately filed so as to reflect 100 percent with the result the industry employees would become all black or nearly so. This is a strange anomaly. An industry could never become all white without being discriminatory, but it could become all black without being discriminatory—(at all cost we must avoid situations that would require considerations of questions of reverse discrimination). Another glaring anomaly is that if such theory is accepted and followed, what occurs when the ratio of applicants vary from day to day, week to week and year to year? Industry would never

know when it was or was not in compliance, and can't you imagine the argument if the application ratio fell below the area work force ratio!

Union Carbide, the defendant, was established in Mobile County in 1965. It has in its employment over 26 percent of its hourly employees who are members of the minority group; in addition, it is actively recruiting minorities in its salary and professional employee classifications. This defendant has an affirmative action program which compels them to actively recruit members of minority groups and they are currently employing minorities in an excess of 30 percent per annum.

The Court appreciates the past economic plight of the black people in the South and specifically in the Mobile labor market, but it also can appreciate that prior to the mid-1950's whites, as a class, were economically near the poverty level. In the 1950's industries began to expand and moved to the South which assisted the financial growth of all the people. Subsequent to the passage of Title VII, the major industries in this locality, Alcoa, Scott Paper Company, International Paper Company, Courtaulds North America, Inc., International Longshoremen Association have in their employment in excess of 26 percent of their employees who are members of minority groups, with the ILA having a membership in excess of 95 percent black. These same companies are now employing minorities at a 30–40 percent rate.[3]

This Court is not blind to the fact that in substantial measure this present day hiring practice was brought about by a change in the law and emphasis thereon. Indeed this is the hoped for result where any law charts a new plotted course. As the Court of Appeals has indicated, we are not here concerned with motives but facts. If we are to measure the liability of this defendant by its maintaining its "quota" it passes muster unless we adopt the plaintiffs'

theory, and even if we should, the defendant has shown sufficient business purpose to justify its discrimination in the selection of its employees. (I realize the use of the term "discrimination" in the foregoing sentence may be badly chosen and possibly "selectivity" or something of that nature would be better used, but I believe the word still carries a connotation that ought to be acceptable and it is in that connotation that it is used.)

Having set out the parameter of the law which must guide this Court's determination of the issues involved let us consider with more specificity the facts as they apply to the remaining issues.

## FINDINGS OF FACTS

1. This Court has jurisdiction of this case pursuant to 28 U.S.C., Section 1343(4); 42 U.S.C., Section 2000e(f) and 28 U.S.C., Sections 2201 and 2202. Defendant is charged with violating (a) Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq., (b) 42 U.S.C., Section 1981, providing for the equal rights of all persons in every State and Territory within the jurisdiction of the United States.

2. Union Carbide is an employer in an industry affecting interstate commerce within the meaning of Section 706(b) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e–5(b).

3. Plaintiffs have complied with the procedural requirements of Section 706(a), (d) and (e) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e–5(a), (d) and (e).

4. This case is filed as a class action making broad general allegations of violations of the Civil Rights Acts. The plaintiffs are black employees of the defendant or unsuccessful black applicants for employment with the defendant.

5. The defendant operates a high technology plant and manufactures a product known as "molecular sieves" at Chickasaw, Alabama. As of October 1,

---

3. Prior case statistics filed in this Court.

1973, the defendant employed 314 persons at this plant; 180 of said 314 employees were hourly production, maintenance and warehouse employees and 46 or 26 percent of them were black; the remaining 134 employees were exempt and non-exempt salaried employees; 71 of said 134 exempt and non-exempt employees were engineers or technicians. The Mobile area work force in which this plant of the defendant is located consists of approximately 26 percent black or other minorities.

In production, there are three hourly job classifications: chemical operator trainee, chemical operator, and senior chemical operator. All of the production workers of the same job classification do not work in the same areas of the plant nor do they have the same duties, but they are all paid at the same rate, and have the same opportunities for advancement. In maintenance, there are the following hourly job classifications: group leader, mechanic, electrician A, maintenance man, electrician B, maintenance utility man, electrician C, oiler, helper, instrument technician, and maintenance trainee. In the warehouse there are two hourly job classifications: group leader and warehouseman. There are no lines of progression, and employees may bid from one department to another on a seniority basis. A great majority of the hourly employees are classified as chemical operators in production. These chemical operators operate, regulate and control chemical processing equipment. A chemical operator earns $4.12 per hour after 9 months and averages earning about $10,000.00 per year counting shift differentials and overtime.

In the salaried ranks, there is a large number of job classifications, both exempt and non-exempt, but basically they can be catagorized as: maintenance and production supervisors, engineers, managers, laboratory and other technicians, clerks, and clerical employees.

6. In addition to the blacks employed by the defendant in production in the chemical operation classifications blacks are employed in maintenance in the following classifications: maintenance mechanic, oiler, trades helper, stores attendant and in warehousing in the following classification: warehouseman. All hourly jobs are filled on a seniority bid basis with the skilled maintenance jobs requiring demonstration of the skill involved. Production jobs are worked on a rotating shift basis.

7. The defendant has black and other minorities employed in the following salaried positions: production foreman, employee relations assistant, plant accountant, quality control shift leader, quality control technician, quality control analyst, junior instrument technician, engineer, buyer, production clerk, stenographer, and clerk-typist.

8. The defendant's Chickasaw plant began operations in April 1965 and during the period 1965 through 1969 the defendant employed 37 black employees and 166 white employees. In 1970 defendant hired 5 black employees and 9 white employees; in 1971 defendant employed 10 black employees and 7 white employees; in 1972 defendant employed 25 black employees and 48 white employees and in 1973 defendant employed 19 black employees and 68 white employees.

9. The defendant accepts applications for employment at all times, whether or not vacancies currently exist, and has an actively implemented affirmative action program for seeking, hiring, training and promoting minority citizens. The defendant's hiring procedures do not depend upon the subjective recommendation of any one person but require a diversified input of recommendations based on a written application by an applicant for employment and interviews with personnel department representatives and plant supervisory personnel as well as reference checks in order to determine an applicant's qualifications for and interest in the job applied for.

10. There is no substantial disparity between the percentages of black em-

ployees of the defendant and blacks in the labor force in the Mobile area. Approximately 31 percent of the employees hired by the defendant during 1970, 1971, 1972 and 1973 have been black.

11. The defendant has promoted and hired black and other minorities into salaried jobs and is implementing its adopted affirmative action program and actively seeking blacks and other minorities for engineering and technical jobs.

12. There is no discrimination in the defendant's promotion practice. Promotion procedures do not depend upon the subjective recommendation of an employee's immediate supervisor but require a diversified input of names and applications for the vacancy and actively involve the line supervision, personnel department representation, and management in its selection process. There is no basis for hint or implication that here the white man will not comply with his obligation under the law and fairly consider all regardless of race. Indeed, the present process has established blacks in positions where they too are involved in decision making.

13. Plaintiffs make the argument that although the defendant's employment record at its Chickasaw, Alabama plant is good and bears a favorable balance in regard to the Mobile area work force, a survey of the total number of applications filed with the defendant during 1972 and 1973 indicates that approximately 50 percent of the applications are by black persons and the defendant hired only 34 percent black in 1972 and 22 percent black in 1973. The plaintiffs contend that in view of their statistics the defendant's hire rate of 34 percent and 22 percent black in 1972 and 1973 instead of 50 percent is prima facie discriminatory.

This argument and the evidence offered in support thereof failed to take into consideration that the applicant ratio is a constantly changing and fluctuating situation subject to all of the indefiniteness of application motivations and qualifications including the possibility of manipulation. The Mobile area work force is a fixed, determinable and recognized grouping and a plant work force with a black-white ratio nearly approximately the area work force with no evidence being presented of any deliberate design toward that end is strongly suggestive to this Court that the employer is not discriminating in its hiring procedures.

Defendant has provided truly equal access to the jobs at its Chickasaw plant by blacks and whites and the Court finds that this has in fact produced an employee population with substantially the same proportion of blacks represented as are in the Mobile area work force generally.

14. Defendant's efforts to involve minorities in its skilled maintenance jobs are to be commended. There is no evidence of any discrimination by the defendant in its skilled maintenance job training programs or in the tests used in these programs. The tests are job related and bear directly on the skills needed to perform the job. These tests did not disqualify blacks at a substantially higher rate than whites and blacks who have successfully completed these programs are performing successfully in skilled jobs with the defendant.

15. None of the named plaintiffs were denied an equal opportunity for promotion on account of his race.

16. None of the named plaintiffs were harassed on account of his race.

17. None of the named plaintiffs were denied employment by the defendants on account of unlawful racially discriminatory hiring policies or practices.

18. *Freddie Robinson*—This plaintiff alleged that he was denied an equal opportunity for promotion, was harassed, was refused his claim for disability pay, and was denied the opportunity to return to work when his doctor released him, all on account of racial discrimination by the defendant.

Plaintiff was employed by the defendant in December of 1968 and voluntarily quit his employment in May of 1973.

During most of the time that he was employed he also was attending college at a local university and had advised his fellow workers and the defendant that as soon as he had obtained his degree from the university he intended to terminate his employment with the defendant and seek another job. This he did. He graduated in May of 1973 and quit his employment the same month. During the last weeks of his employment an apparent conflict developed between the requirements of the job and the school. Plaintiff Robinson chose the school.

In March of 1973 plaintiff Robinson requested special treatment in arranging his work schedule to accommodate his school schedule. The accommodation could not be made due to the involvement of other employees and their asserted seniority rights. Failing in the rearrangement of his work schedule plaintiff Robinson announced that "I've got a way to work out the schedule". This occurred on Friday, March 23, 1973. His next scheduled work day was Monday, March 26. On that morning he called in sick. A routine investigation and medical examination did not verify this alleged sickness. In fact, Robinson was attending classes at the university during the period he was supposed to be unable to work. Failing to report for work as requested by the defendant he was suspended. Thereafter in May he voluntarily quit his employment. A required written application for disability benefits was never submitted by him.

The Court finds that plaintiff Robinson was not unjustly refused his claim for disability pay and was not wrongfully denied the opportunity to return to work. The Court further finds that the defendant's action in not paying plaintiff Robinson disability pay and in suspending him from his job for failing to report as designated was based on valid employer prerogatives and was not the result of discrimination against this plaintiff on account of his race. Also in accordance with the Court's other findings of fact no basis is found for this plaintiff's allegation of harassment or denial of promotion as a result of racial discrimination. This plaintiff's announced intention to quit his employment upon graduation from college removed him from consideration for promotion, assuming he was qualified for the job opening. Also the Court does not find any racially motivated harassment of this plaintiff. All requirements made of this plaintiff were completely job related, non-discriminatory, and based on valid employer prerogatives.

19. *Peter Reese*—This plaintiff alleges that he was denied promotions on account of his race, in particular to the jobs of safety technician and semi-works technician. Plaintiff Reese was employed by the defendant in March 1968. Prior to his employment with the defendant he had worked as a medic in the army and as a medical technician in the reserve. While plaintiff Reese was in the initial weeks of his employment and in the training program for a chemical operator job, an opening occurred in the safety technician job in the defendant's plant. This job required the maintenance of a comprehensive plant safety program. The job involved the keeping of regular surveillance of the overall plant area to make and note on the spot inspections of unsafe actions and hazardous conditions; the coordination of the activities of the Employee Safety Committee; the conducting of formal plant safety inspections on a regular schedule; the investigation and analysis of accidents and injuries as well as certain first aid services. Complete familiarity with all phases of the plant operation was obviously a necessity. As a new employee plaintiff Reese did not have this familiarity. The job was awarded to an employee with several years of overall plant experience. Further, plaintiff Reese made no application for this job and did not advise anybody that he was interested in this job. The Court finds no racial discrimination in the failure of the defendant to award this job to the plaintiff.

The semi-works is a small pilot testing operation separate and apart from

the main production plant. The semi-works technician is required to work under the direct supervision of an engineer or semi-works technologist and to record and perform processing experiments and procure plant materials and data. This employee must be familiar with all phases of a molecular sieve plant and be able to operate all mechanical equipment in the semi-works laboratory, collect samples and plan and perform certain laboratory experiments. This job became available in May of 1971 and was awarded to a senior chemical operator with several years experience in all phases of plant operations. Again, Plaintiff Reese made no application for this job and did not advise anybody that he wished to be considered for the job. The Court finds no racial discrimination in the failure of the defendant to award this job to this plaintiff. Further, the Court find that the employer's determination was based on valid employer prerogatives to employ the best qualified man for the job.

20. *Jerome Fitts*—Plaintiff Fitts alleges that he was harassed by his white supervisor by the use of abusive language and that such harassment was racially discriminatory. He testified that his foreman told him "to move those damn drums" and he felt this language was not professional and racially discriminatory. The Court finds from the evidence that these remarks were not racially motivated or discriminatory but only an attempt by a foreman to get a job done. The defendant did not ratify or countenance them.

21. *Cynthia Caldwell*—Plaintiff Caldwell alleged that she was denied employment by the defendant because of her race. In particular she contends that she was qualified for a laboratory technician job and was not hired because she was black. Plaintiff Caldwell applied for work in February of 1972. She was a graduate of Tuskegee Institute with a major in biology and a minor in chemistry. She was advised by the defendant in July of 1972 that they were not hiring people with degrees in the laboratory at that time. She made a new application for employment in September of 1972. Thereafter she was advised by the defendant that she was over qualified for a lab job. In March of 1973 she made written inquiry about employment with the defendant and requested an application. The defendant forwarded an application to her but did not hear from her again. The laboratory technician jobs with the defendant involved routine analysis and testing. An employee with high school chemistry can adequatly perform the job. Numerous blacks have been and are presently employed· in these jobs. Experience has shown this defendant that an over qualified person in this job quickly becomes bored with the routine activity and becomes dissatisfied. Two former black employees of the defendant who worked in the lab testified that the job was routine and boring and could be adequately performed by someone with a high school chemistry background. One of these, Fred White, had left the defendant's employment to seek additional education as a chemical engineer. He testified that he was graduating in the near future and was being actively recruited by the defendant as a chemical engineer. Therefore, in view of the number of blacks in various jobs in the laboratory as well as the number of blacks in other jobs with this defendant and the active minority recruitment activity of this defendant and the fact that plaintiff Caldwell was over qualified for a lab job, the Court finds there has been no racial discrimination by this defendant in not hiring this plaintiff.

22. *Ronald L. Coleman*—This named plaintiff's claim to fame in this litigation is that he, along with thousands of others, made application for employment; he is black, and was not employed; that in itself imposes a liability on the defendant. Contrary to plaintiff Coleman's contention, a company is not compelled to employ every job applicant just because he is a member of a minority group. The only requirement imposed on employers in which the defend-

ant has in existence is a non-discriminatory employment procedure.

23. *Willie L. Jones*—The allegations of this plaintiff are three-fold: (1) He was harassed by his supervisor; (2) made to perform more work than white employees; and (c) denied off-duty educational assistance on account of his race. The "harassment" and "more work" theories are the result of plaintiff Jones being assigned duties within the function of his job, which he was paid to perform, and should have been performing. His direct refusal resulted in a five day suspension, after which his contention because the whites were not doing the details of the job, why should he. The Court does not believe Mr. Jones was required to perform more work than others, nor has he been harassed. In essence, the whole tenure of the evidence before the Court has been the militant belligerent attitude of certain blacks perpetrated by the paternalistic attitude of the management at Union Carbide by permitting certain blacks to take advantage of all.

This Court would have readily sustained the discharge of Mr. Jones for this incident in question, if the company had so decided and consummated.

As for Mr. Jones' off-duty educational assistance claim, this is another absurdity. Mr. Jones worked shifts and desired to be given preferred treatment by being assigned to days; not be required to work overtime and thus placing job responsibility for his fair share of overtime on others; and be able to be absent from work when the work conflicted with school; and be paid for everything. A company is not required to "close its doors" in order to provide educational opportunities.

24. *Paul Richardson, Willie J. Mickles, Olney W. Lucious, III* and *Thomas S. Austin, Jr.* are contending they were denied promotions because of their race. It is their belief they were entitled to specific promotions because they were "more" qualified than the individuals who obtained the promotions, notwithstanding the facts those who received the promotions were qualified and had more seniority. It is the procedure of Union Carbide on promotions to obtain an input of names from all sources; analyze the qualifications of all, with qualifications being the primary factor. When more than one is qualified, seniority prevails. There was no showing this procedure is discriminating.

## CONCLUSIONS OF LAW

1. Defendant's refusal to make changes in work schedules or overtime assignments to allow plaintiffs to participate in non-work activities was not racially motivated nor did it constitute harassment. The "business necessity" criteria as announced in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, is only applicable if racial practices are employed. Absent proof of racial motivation, defendant is not bound by the business necessity criteria as mandated by Title VII of the Civil Rights Act of 1964.

2. Employment practices which perpetuate or tend to perpetuate past discrimination are forbidden by Title VII to the extent they are not supported by overriding legitimate, non-racial business necessity. Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Rowe v. General Motors Corp., (5th Cir. 1972), 457 F.2d 348. It is not enough under Title VII that the procedures utilized by employers are fair in form, they must be, in fact, fair in operation. Rowe v. General Motors Corp., supra. In this case defendant's procedures are both fair in form and fair in fact.

3. Statistical evidence in Title VII cases are given critical weight in this Circuit. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Johnson v. Goodyear Tire and Rubber Co., 491 F.2d 1364 at 1371–1373.

Employment statistics produced by plaintiffs did not demonstrate a major disparity between employment and the available work force according to race, thus plaintiffs' evidence does not establish a prima facie case. United States v. Jacksonville Terminal Co., 451 F.2d 418 at 424–436.

■ 4. The plaintiffs' evidence failed to prove their allegation that the company discriminated on racial grounds with respect to employment and promotion of supervisory personnel. The plaintiffs here have not shown any instance of a qualified black who applied for and was rejected promotion to a supervisory position.

Input and participation of blacks in the selection of supervisory personnel (which occurred in this cause) was held to be essential to insure non-discriminatory action. Pettway v. American Cast Iron Pipe Co., supra.

■ 5. The seniority system utilized by defendant is legal on its face and in practice and does not discriminate, Local 189 v. United States, 416 F.2d 980 (5th Cir. 1969).

6. Title VII provides that the reinstatement of an employee may not be ordered when the discharge was for any reason besides prohibited discrimination.

Although it was certainly not necessary to have done so, Congress expressly provided in Title VII that:

"No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 704(a)."

■ The point of the matter is that an employee's race does not insulate him for discharge. Andres v. Southwestern Pipe, Inc., D.C., 321 F.Supp. 895, affirmed per curium, 446 F.2d 899 (5th Cir. 1971). In weighing the evidence in this matter neither members of the class nor individual plaintiffs were disciplined, harassed or discharged based on racial grounds. There simply was no credible evidence in this case that any employee was harassed. In fact plaintiff Robinson's actions were tantamount to quitting his employment.

7. Title 42, U.S.C., Section 2000e–2(j) reads:

"Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparision with the total number of percentage of persons of such race, color, religion, sex, or national origin in any community, State, section or other area, or in the available work force in any community, State, section, or other area."

This principle was definitely expressed by Chief Justice Burger in writing for the Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. In a passage which the Fifth Circuit has referred to as "what may be the last word on this issue"

United States v. Jacksonville Terminal Co., 451 F.2d 418, the Chief Justice stated:

"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed." (401 U.S. at 430–431, 91 S.Ct. at 853).

 To employ any group at a rate that greatly exceeds that group's composition of the work force in the community is to give discriminatory preference in violation of Title VII of the Civil Rights Act of 1964.

8. The Court must be skeptical when there exists a major disparity by race between the ratio of job applicants to any individual employer to that of the racial composition of the available work force in the community. The Court must suspect concerted effort when this major disparity exists.

 9. An award of costs and attorneys' fees is discretionary with the Court. The Act provides that they may be awarded, 42 U.S.C., Section 2000e–5(g). The standards to be applied are set forth in Johnson v. Georgia Highway Express, Inc., 5 Cir., 488 F.2d 714. Plaintiffs are not entitled to an award of costs or attorneys' fees as they did not prevail in whole or in part, Miller v. Amusement Enterprise, 426 F.2d 534 (5th Cir. 1970).

### JUDGMENT

In accordance with the Findings of Facts and Conclusions of Law entered by this Court in this cause on the 29th day of August, 1974, it is ordered, adjudged and decreed that judgment be entered for the defendant, Union Carbide Corporation. Costs are taxed to the plaintiffs.