**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**GEORGIA–PACIFIC CORPORATION, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, its Plywood Workers Local Union 3181, United Papermakers and Paperworkers, AFL–CIO, its Local Union Number 1076, International Woodworkers of America, AFL–CIO, CLC, and its Local Union 5–349, Defendants.**

No. EC 74–134–S.

United States District Court,
N. D. Mississippi, E. D.

Dec. 8, 1977.

W. L. Williams, Jr., Mildred Byrd, E. E. O. C., Atlanta Regional Office of Gen. Counsel, Atlanta, Ga., for plaintiff.

Arnold Pyle, Ernest Taylor, Watkins, Pyle, Ludlam, Winter & Stennis, Jackson, Miss., Charles K. Howard, Jr., Atlanta, Ga., Phil McClendon, Crosett, Ark., for Georgia-Pacific.

John Maxey, Danny E. Cupit, Cupit & Maxey, Jackson, Miss., for Paperworkers and Woodworkers.

Charles R. Davis, Thomas, Price, Alston, Jones & Davis, Jackson, Miss., Charles Youngdahl, Youngdahl & Larrison, Little Rock, Ark., for Plyworkers and Article Bd. Workers.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action has been submitted for decision after a full evidentiary hearing at a non-jury trial. The court having considered the evidence introduced and the entire file, now makes the findings of fact and conclusions of law as hereinafter more fully set forth.

### I. *The Parties and Plants Involved*

#### A. Plaintiff.

Plaintiff is the Equal Employment Opportunity Commission (hereafter "EEOC") an agency of the United States charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e, et seq.

#### B. The Principal Defendant.

Defendant is the Georgia-Pacific Corporation (hereafter "Georgia-Pacific"), a Georgia corporation doing business in Mississippi, in or near the Cities of Louisville, Bay Springs, Gloster, and Taylorsville, where it engages in the growing and harvesting of trees and the manufacture of forest products.

Georgia-Pacific is domiciled in Augusta, Georgia, and has its corporate offices in Portland, Oregon. During all times pertinent to this action, Georgia-Pacific has been and is now an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C.A. §§ 2000e(b), (g) and (h). Georgia-Pacific has continuously since at least July 2, 1965, and does now, employ more than 25 people.

#### C. Other Defendants.

The following labor unions are parties defendant:[1]

1. The Plywood Workers Local Union No. 3181 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereafter "Local 3181") representing the production and maintenance employees of Georgia-Pacific at its plywood plant at Louisville.

2. The Plywood Workers Local Union No. 2086 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereafter "Local 2086") representing the production and maintenance employees at Georgia-Pacific's plywood plant at Taylorsville.

3. The Particleboard Workers Local Union No. 2153 (hereafter "Local 2153") representing the production and maintenance employees at Georgia-Pacific's particleboard plant at Taylorsville.

4. The United Papermakers and Paperworkers International Union AFL–CIO (hereafter "Paperworkers International").

5. Paperworkers Local Union No. 1076 of the United Papermakers and Paperworkers International Union AFL–CIO (hereafter "Local 1076") representing the production and maintenance employees of Georgia-Pacific at its particleboard plant at Louisville.

6. International Woodworkers of America, AFL–CIO CLC (hereafter "International Woodworkers").

7. International Woodworker's Local Union No. 5–349 (hereafter "Local No. 5–349") representing the production and maintenance employees of Georgia-Pacific at its plywood plant at Gloster.

During the time herein pertinent, each of the said labor unions has been and is now a labor organization engaged in an industry affecting commerce within the meaning of Section 701(d) and (e) of Title VII, 42 U.S.C.A. §§ 2000e(d) and (e).

---

1. The labor defendants are in this case solely as parties for the purpose of injunctive relief, if any be awarded, pursuant to Fed.R.Civ.P. 19(a)(2).

D. Plants involved in action.[2]

The following plants and operations of Georgia-Pacific are involved in the case:

1. Louisville:
   (a) Plywood
   (b) Particleboard plant
   (c) Chemical Plant
   (d) Forestry division
2. Taylorsville:
   (a) Plywood plant
   (b) Particleboard plant
   (c) Chemical Plant
   (d) Forestry operation
3. Gloster:
   (a) Plywood plant
   (b) Forestry operation
4. Bay Springs:
   (a) Chip-n-Saw plant

## II. *History of Litigation*

### A. Filing and disposition of charges.

Charges of discrimination in employment practices on account of race were filed with EEOC by several individuals who were employees or former employees of Georgia-Pacific. These charges and the disposition made of them by EEOC are listed as follows:

| Date of Filing | Charging Party | Location |
|---|---|---|
| 1. Sept. 30, 1971 | Carlos Marshall | Taylorsville Particleboard |
| 2. March 1, 1972 | Daniel Pittman, Jr. | Taylorsville Plywood |
| 3. April 26, 1972 | Edward Ray Barnes | Taylorsville Plywood |
| 4. February 7, 1973 | Edward L. Nix | Taylorsville Plywood |
| 5. May 23, 1973 | Q. C. Jones | Taylorsville Plywood |
| 6. December 5, 1974 | Hubert W. Nicholson | Louisville Particleboard |
| 7. August 7, 1972 | Fabieus Robinson, Jr. | Gloster Plywood |
| 8. November 5, 1974 | Elmyra Peyton | Bay Springs Chip-n-Saw |

### 1. Carlos Marshall.

The complaint of Carlos Marshall was investigated by EEOC and a determination made November 30, 1972, that reasonable cause did not exist to believe that Mr. Marshall was discharged because of his race; however, the EEOC made a determination that reasonable cause existed to believe that Georgia-Pacific was guilty of unlawful employment practices in the hiring, assignment and promotion of black employees.

### 2. Daniel Pittman, Jr.

The EEOC determined that reasonable cause did not exist for the charge that

2. The chip-n-saw plant at Bay Springs, the chemical plants and forestry operations at

Pittman was discriminated against on account of his race because he was not hired at the Taylorsville Plywood Plant, however, the EEOC found that reasonable cause existed for the charge that Georgia-Pacific failed to consider him for employment on account of his race at its Particleboard plant at Taylorsville.

### 3–5. Edward Ray Barnes, Edward Louis Nix and Q. C. Jones.

An investigation was made on the charges filed by Edward Ray Barnes, Edward Louis Nix and Q. C. Jones, against the Taylorsville operation. EEOC found that there did not exist reasonable cause to believe that Georgia-Pacific discriminated against them, or either of them, in the manner set forth in the charge. EEOC found, however, that reasonable cause existed to sustain a belief that Georgia-Pacific engaged in employment practices which discriminated against members of the black race.

### 6. Hubert Nicholson.

Hubert Nicholson's charge related to the Louisville Particleboard operation. The determination was made that while the available evidence did not support the charge that Nicholson was specifically denied transfer to the position in question, his charge related to alleged violations of a continuing nature. The conclusion was reached that reasonable cause existed to find that Georgia-Pacific had engaged in unlawful employment practices.

### 7. Elmyra Peyton.

The charge filed by Elmyra Peyton against the chip-n-saw operation at Bay Springs, led to a determination that reasonable cause existed to sustain the charge that the saw mill operation engaged in unlawful employment practices in that Georgia-Pacific maintained a policy of hiring and assigning persons to certain departments and classifications because of their race.

Louisville and Taylorsville, and the forestry operation at Gloster are not unionized.

8. Fabieus Robinson, Jr.

Mr. Robinson filed his charge on August 7, 1972. This charge alleged that Mr. Robinson was denied reinstatement to his position of dryer-feeder on account of his race. Mr. Robinson had been terminated on April 4, 1970, and sought to be rehired in the summer of 1971. Mr. Robinson had no further contact with the company between the summer of 1971, and the filing of his charges in 1972. The EEOC found no reasonable cause to believe that Mr. Robinson had been discriminated against by the failure of Georgia-Pacific to rehire him. Mr. Robinson had been discharged on November 6, 1969, for being absent without calling in or sending word. He was not rehired in 1972 because of his past record of absenteeism.

B. The Pleadings.

The complaint filed November 7, 1974, alleges that since July 2, 1965, Georgia-Pacific has continuously and intentionally engaged in unlawful employment practices at its Bay Springs, Gloster, Louisville, and Taylorsville, operations and facilities, in violation of Sections 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e–2(a) and 2000e–3(a). EEOC initially sued Georgia-Pacific, and certain labor organizations, i. e., United Brotherhood of Carpenters and Joiners of America, AFL–CIO (dismissed from the action by the court's order of February 12, 1975) its Local Union 3181, United Papermakers and Paperworkers, AFL–CIO, its Local Union 1076; International Woodworkers of America, AFL–CIO, CLC, and its Local Union 5–349. Thereafter, on May 17, 1976, responding to the court's directive, EEOC filed an Amendment to the Complaint making Plywood Workers Local Union 2083 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO and Particleboard Workers Local 2153, of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Rule 19(a)(2) defendants.

Georgia-Pacific and the above-named labor unions filed appropriate answers to the complaint as amended.

III. *Location and Type of Facilities Involved, Union Representation*

The location and type of facilities and the union representation at each plant involved in this action are:

A. Louisville.

1. A plywood manufacturing operation; the Southern Council of Industrial Workers and Plywood Local 3181 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

2. A particleboard manufacturing operation; the United Papermakers and Paperworkers International Union, AFL–CIO, and its Local Union Number 1076;

3. A chemical manufacturing operation; no union;

4. A forestry operation; no union.

B. Taylorsville.

1. A plywood manufacturing operation; the Southern Council of Industrial Workers and the Plywood Workers Local 2086 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO;

2. A particleboard manufacturing operation; the Southern Council of Industrial Workers and Particleboard Workers Local 2153 of the United Brotherhood of Carpenters and Joinders of America, AFL–CIO;

3. A chemical manufacturing operation; no union;

4. A forestry service office; no union.

C. Bay Springs.

1. A "chip-n-saw" manufacturing operation (saw mill); no union.

D. Gloster.

1. A plywood manufacturing operation; the International Woodworkers of America and its Local 5–349;

2. A forestry operation; no union.

IV. *Collective Bargaining Provisions*

A. Georgia-Pacific, prior to 1976, maintained pursuant to its collective bargaining

agreements at its Mississippi Particleboard and Plywood operations, departmental seniority for promotion purposes and plant wide seniority for transfer purposes; particularly: Louisville Plywood and Louisville Particleboard, Taylorsville Plywood and Taylorsville Particleboard and Gloster Plywood. This procedure has continued in these plants with the exception of Gloster Plywood and Louisville Plywood. These plants, pursuant to new collective bargaining agreements which became effective on January 19, 1976, at Louisville, and December 1, 1976, at Gloster, have plant wide seniority system for all purposes.

The labor agreements establish the departmental organization, lines of progression and method of promotion at each facility covered by these labor agreements, as follows:

1. Gloster Plywood.

The production and maintenance hourly employees at this location are represented by Local 5–349 which was certified as the exclusive collective bargaining representative for these employees by the National Labor Relations Board on May 25, 1967. Since that time there have been several labor agreements negotiated with the last and current agreement having a term of three years expiring on December 1, 1979. These agreements established the terms and conditions of the employment relationship between the company and its hourly employees at this work location. These agreements established six departments at this location and provided for progression within each of these departments from lower paying to higher paying jobs on the basis of department seniority. When a permanent opening occurs which cannot be filled through the promotional program such opening is posted for bid and eligible employees may fill out request for transfer to the vacant position. Selection of the employee to fill the opening is made from among those who complete such request on the basis of plant seniority. The contract also established maintenance and electrical Trainee positions which are filled on the basis of plant seniority and bid.

2. Louisville Plywood.

Each of the agreements negotiated between the carpenters and the company prior to the last agreement relative to this plant established nine (9) departments. (Log handling, green end, veneer processing, gluing, press section, finishing and shipping, maintenance, boiler house, and clean-up.) Promotions were made automatically on a Departmental Seniority basis from the lower paying to the higher paying job classification in each department provided the senior employee has the ability to perform the work. The contracts further provided for transfer into the entry level positions in each department from the other departments on the basis of plant seniority. Employees therefore have an opportunity to select the department of their choice after hire and initial assignment.

The January 19, 1976, agreement established a plant wide posting bidding system for filling all permanent vacancies in the plant in which plant seniority is the length of service criteria applied.

3. Louisville Particleboard.

The union defendant at this plant, the United Paperworkers International Union, AFL–CIO and its local Union No. 1076, was certified as the exclusive collective bargaining representative on November 27, 1967, by the National Labor Relations Board. The first labor agreement negotiated between the Union and the Company became effective on February 17, 1968. There have been two subsequent 3 year contracts which became effective on February 17, 1971 and February 17, 1974, respectively. These contracts have set up five departments: namely, process, finishing and shipping, laboratory, maintenance and miscellaneous. Under these contracts, promotions have been made automatically on a departmental seniority basis from the lower paying to the higher paying job classifications in each department provided the senior employee has the ability to perform the work. The contracts further provided for transfer into the entry

level positions in each department from the other departments on the basis of plant seniority. Pursuant to this plant-wide system, newly hired employees are offered their choice of entry level jobs in the lines of progression. They may accept or refuse and wait for a vacancy in the line of progression of their choice. Employees therefore have an opportunity to select the department of their choice after hire and initial assignment to the entry level General Labor classification.

4. Taylorsville Plywood.

This agreement established ten (10) departments in the plant: woodyard and lathe, green chain, veneer processing, gluing and pressing, finishing and shipping, power plant, maintenance, stud mill, jitney and general plant.

This agreement creates and utilizes two types of seniority, department and plant. Promotions are made on the basis of departmental seniority and occur automatically from the lower to the higher paying jobs in the department after employees already working in the vacant job on another shift have an opportunity to choose the shift of their choice. The entry level jobs in each department are posted plant wide when they become vacant and are filled on the basis of bidding and plant seniority prior to hiring new employees. Employees therefore have an opportunity to select the department and line of progression of their choice after hire and initial assignment.

5. Taylorsville Particleboard.

The agreement established five departments in the plant: process, finishing and shipping, maintenance, mende, and miscellaneous (general helper). New employees are hired and initially assigned to the general helper classification in the Miscellaneous Department. After completion of a probationary period the employee may request a transfer to the entry level job in the department of his choice on the basis of his total length of service. Therefore, employee choice, not company assignment, determines which department a new employee is assigned to. After selecting a department, the employee is promoted along the established line of progression in that department (from lower paying to higher paying jobs) in accordance with his job seniority in the job in which he is working.

·V. *Statistics*

A. Plywood Facilities.

1. Louisville Plywood

Summary of hourly workforce as of January 31, 1977:

| | | |
|---|---|---|
| Total employees | | 295 |
| White | 86 | |
| Black | 208 | |
| Indian | 1 | |
| | % Black | 70.5 |
| Skilled maintenance | | |
| Total | | 28 |
| White | 24 | |
| Black | 4 | |
| | % Black | 14.3 |
| Non-maintenance positions paying more than $4.00 per hour | | |
| Total | | 74 |
| White | 19 | |
| Black | 55 | |
| | % Black | 74.3 |

2. Taylorsville Plywood

Summary of hourly workforce as of January 28, 1977:

| | | |
|---|---|---|
| Total employees | | 311 |
| White | 119 | |
| Black | 192 | |
| | % Black | 61.7 |
| Skilled maintenance positions | | |
| Total employees | | 35 |
| White | 32 | |
| Black | 3 | |
| | % Black | 8.6 |
| Non-maintenance positions paying over $4.00 an hour | | |
| Total employees | | 32 |
| White | 15 | |
| Black | 17 | |
| | % Black | 53.1 |

3. Gloster Plywood

Summary of hourly workforce as of January 28, 1977:

| | | |
|---|---|---|
| Total employees | | 291 |
| White | 62 | |
| Black | 229 | |
| | % Black | 78.6 |
| Skilled maintenance | | |
| Total | | 35 |
| White | 30 | |
| Black | 5 | |
| | % Black | 14.3 |

## V. *Statistics*—Cont'd

### A. Plywood Facilities—Cont'd

#### 3. Gloster Plywood—Cont'd

Non-maintenance positions paying more than $4.50 an hour

| | |
|---|---|
| Total | 9 |
| White | 3 |
| Black | 6 |
| % Black | 66.6 |

Non-maintenance positions paying more than $4.00 an hour

| | |
|---|---|
| Total | 44 |
| White | 13 |
| Black | 31 |
| % Black | 70.4 |

### B. Saw-Mill Facility.

1. Bay Springs Chip-n-Saw

Summary of hourly workforce as of January 28, 1977:

| | |
|---|---|
| Total employees | 72 |
| White | 25 |
| Black | 47 |
| % Black | 65.2 |
| Total Skilled Maintenance | 7 |
| White | 4 |
| Black | 3 |
| % Black | 42 |

Maintenance Department

| | |
|---|---|
| Total Employees | 6 |
| White | 4 |
| Black | 2 |
| % Black | 33.3 |

Highest Paid Positions:

| | |
|---|---|
| Hourly Rate | 5.26 |
| White | 1 |
| Black | 1 |
| Total | 2 |
| Hourly Rate | 4.50 |
| White | 4 |
| Black | 3 |
| Total | 7 |
| Total all highest paid positions | 9 |
| White | 5 |
| Black | 4 |
| % Black | 44 |

### C. Particleboard Facilities.

1. Taylorsville

Summary of workforce as of March 1, 1976:

| Department | Total | Black | White |
|---|---|---|---|
| Process | 21 | 6 | 15 |
| Finishing & Shipping | 18 | 3 | 15 |
| Maintenance | 22 | 0 | 22 |
| Miscellaneous | 19 | 9 | 10 |
| Mende* | 0 | 0 | 0 |
| | 80 | 18 | 62 |
| | (23% Black) | | |

* shut down

2. Louisville

| Department | Total | Black | White |
|---|---|---|---|
| Process | 21 | 8 | 13 |
| Finishing & Shipping | 14 | 7 | 7 |
| Laboratory | 4 | 0 | 4 |
| Maintenance | 19 | 0 | 19 |
| Miscellaneous (Entry Level) | 37 | 26 | 11 |
| | 95 | 41 | 54 |
| | (43% Black) | | |

### D. Forestry Operation.

1. Louisville

   a. Summary of hourly employees as of January 31, 1977:

| Name | Race | Job Title | Employment Date |
|---|---|---|---|
| Boydstun, Richard H. | W | Woodsman | 12–19–66 |
| Flucher, Freddy N. | W | Woodsman | 5–16–68 |
| Goss, Jr., Willie | B | Woodsman | 9–25–74 |
| Roberson, Charles D. | B | Woodsman | 8–27–75 |
| Stokes, Carvel E. | W | Woodsman | 1–04–66 |
| Waddell, Larry L. | W | Woodsman | 2–01–66 |
| Warner, Jr., Carlos B. | B | Woodsman | 11–30–73 |

   b. Summary of employees as of March 1, 1976:

   (1) Salaried employees: 12

| | |
|---|---|
| White | 12 |
| Black | 0 |
| % Black | 0 |

   (2) Hourly employees:

| | |
|---|---|
| White | 9 |
| Black | 5 |
| % Black | 55 |

### E. Chemical Facilities.

1. Taylorsville

Summary of hourly workforce employees as of March 1, 1976:

| | |
|---|---|
| Total employees: | 23 |
| White | 15 |
| Black | 8 |
| % Black | 35 |

### F. Miscellaneous Statistics.

As of March 1, 1976, defendant Georgia-Pacific had no blacks employed in skilled

maintenance positions (including electricians, millwrights, millwright trainees) in its Taylorsville Particleboard and Louisville Particleboard operations.

As of March 1, 1976, defendant Georgia-Pacific had 3 blacks employed in skilled maintenance jobs at its Taylorsville Plywood operation, 5 black skilled maintenance employees in its Louisville Plywood operations, and 2 black skilled maintenance employees (1 millwright and 1 sawfiler) employed in its Bay Springs operation.

As of March 1, 1976, defendant Georgia-Pacific employed one black supervisor in its Taylorsville Particleboard operation; two black (of 22 supervisors) supervisors in its Taylorsville Plywood operation; and three black (of 17 supervisors), supervisors in its Louisville Plywood operation.

As of March 1, 1976, defendant Georgia-Pacific employed no black clericals in its operations as follows: Bay Springs, Taylorsville Particleboard, Taylorsville Chemical, Taylorsville Forestry, Gloster Forestry, Louisville Particleboard, Louisville Chemical.

The workforce availability statistics and percentages set forth in the exhibits introduced in evidence are:

1. Bay Springs.

Bay Springs is located in Jasper County near the Smith County Line. The workforce for the Bay Springs saw mill primarily comes from Jasper County. According to the 1970 census, the total labor force for Jasper County was 5850 of whom 2140 are black. Therefore 37% of the total labor force population in this county is black. Persons working as craftsmen, foremen and related jobs total 691; 134 of whom are black (19% black).

2. Gloster.

Gloster, Mississippi, is located in Amite County from which the majority of the workforce is hired. According to the 1970 census, the total workforce population for Amite County is 3,948, 1,627 (41.2%) of which are black. Moreover, 574 of this 3,948 are skilled craftsmen and 150 of the 574 are black (26%).

3. Louisville.

Louisville, Mississippi, is located in Winston County. According to the 1970 census, the total workforce population sixteen years of age and older for Winston County is 5,907 of which 1731 are black (29.00% black). The workforce population sixteen years of age and older in the eight county area immediately around Louisville is 42,827, of which 14,039 is black (32.7%). Moreover, 761 of this 5,907 were skilled craftsmen and 118 of the 761 were black (15.5% black).

4. Taylorsville.

Taylorsville, Mississippi, is located in the southern part of Smith County. The four counties bordering Smith County on the south, east and west are Jasper, Jones, Covington and Simpson. According to the 1970 census, the total workforce population for Smith County is 4,731, 876 whom are black (19% black). The five county area workforce population is 40,551; of which 9,511 are black (23.45% black).

The skilled craftsmen workforce population for Smith County totaled 672, of which 64 was black (9.5% black). The five county skilled craftsmen workforce population was 5,710 of which 631 was black (11.05% black).

## VI. *General Findings*

Georgia-Pacific started its Mississippi operations in the mid-1960's, subsequent to the effective date of Title VII, July 2, 1965. The initial undertaking was to establish a forestry operation at Louisville, Mississippi. This undertaking was followed by the construction of a plywood plant in 1966, a particleboard plant in 1967, and a chemical plant in 1968 at Louisville. Georgia-Pacific instituted a forestry operation in 1966 and a plywood plant in 1967 in Gloster; a forestry operation in 1969 or 1970, a plywood plant in 1970, a particleboard plant in

1971 and a chemical plant in 1972 in Taylorsville; and finally, a chip-n-saw mill (saw mill) in Bay Springs in 1973.

The two chemical plants, one at Louisville, the other at Taylorsville, are not part of the company's Crossett Division, but are in the Southwest Division of the chemical operations. They report directly to Chemical Management of the Southwest Division which reports to Portland, Oregon. All other operations are a part of the Crossett Division, but are supervised by separate and independent management personnel.

Georgia-Pacific maintains separate personnel functions, policies and practices at each plant or operation. At Louisville and Taylorsville where Georgia-Pacific has both a plywood and a particleboard plant, there is a separate collective bargaining agreement governing the personnel practice in each plant.

From the inception of the particleboard and plywood plants at Louisville and Taylorsville, Georgia-Pacific has not allowed hourly employees to transfer from one plant to the other and has maintained the two operations as separate and distinct. The reason the company has done so is that if employees had been allowed to transfer from plywood to particleboard, the company would have suffered substantial economic loss as a result of retraining cost, lost efficiency and lower production of its higher profit cement form plywood.

The manufacturing processes and the jobs performed at the two plants are vastly different. There are different production jobs performed and the structuring of the departments is different. The quality control and the maintenance personnel at these plants perform different types of work. Different raw materials are used in the manufacturing processes. The technology, methods and processes of production are different. Different products are produced for different markets and customers. Each plywood plant employs approximately three times as many employees as a particleboard plant.

The evidence establishes that the cost of retraining and loss of production if the plant personnel were combined would be great. All employees, including maintenance, would have to be retrained in order to work with the vastly different machines and production processes. The particleboard production process is much more technical than the plywood process. As a result of the type of process and because of the number of reports that employees must be able to fill out and comprehend, the company has required particleboard employees to be able to read and write although there is no required educational level. There are no minimum requirements for employment at the plywood plants and the chip-n-saw mill. The particleboard plants have also suffered major economic setbacks which required a number of employees to be laid off. As a result of these layoffs, there have been very few job openings at any level, and especially in the supervisory, maintenance and other higher paying jobs.

The company's two chemical plants are basically similar although Taylorsville plant manufactures formaldehyde as well as chemical resins. Employees in entry level jobs must be able to read, write and perform basic mathematical functions. In order to progress, employees must learn to identify and safely work with dangerous chemicals, and perform laboratory tests which require the use of algebra and other mathematical formulas. These are small operations in terms of personnel size and only one or two employees are hired each year. There are no artificial barriers to employment and an applicant must, because of the extremely hazardous nature of this work, be proficient in reading, writing and basic mathematics. Each plant has always hired and promoted qualified blacks. There is no evidence of any black being denied a job or a promotion which was given to a lesser or equally qualified white. No charges of discrimination have been filed against these plants.

The forestry operations have the responsibility for procuring timber for the company's plants and for the reforestation and maintenance of the woodlands the company

owns and leases in the respective areas of Mississippi. There are two basic types of salaried employees. These are professional foresters who, of necessity, have college degrees in forestry and other forestry employees with extensive experience in forestry management including positions such as timber buyer and technician. There are also hourly employees who perform manual labor and other necessary duties in maintaining the forests. There has never been a black applicant for the professional forester position at any of the three locations even though attempts have been made to recruit such applicants. The company has taken affirmative steps to seek and employ blacks at each location.

Jobs in the forestry operation require extensive travel to and from work areas and most of the work is performed in rural wooded areas. In addition, the pay rates for the forestry operation are substantially below that of the rates at the Gloster, Louisville, and Taylorsville manufacturing plants. These operations have a small number of employees and there has been a relatively small turnover of employees. Blacks have been hired at each location as they applied. There is no evidence of any black being rejected for a job that was given to a lesser or equally qualified white. No employment discrimination charge has ever been filed against any of the forestry operations and the Commission has never issued any determination that the employment practices at the forestry operations are racially discriminatory in any manner.

The evidence reflects that from the beginning Georgia-Pacific endeavoured to comply with the mandate of Title VII to provide nondiscriminatory employment to all qualified applicants for work at its several plants and operations, and to refrain from unlawful employment practices proscribed by 42 U.S.C. § 2000e–2(a). To accomplish this purpose a policy was established at each of the subject plants and operations to make known to the public and prospective job applicants, that Georgia-Pacific is an "equal employment opportunity employer" and to recruit and train qualified employees without regard to race. To ac-

complish this purpose Georgia-Pacific sought the assistance of leaders in both the white and black communities in which its operations are conducted, advertised as an "equal employment opportunity employer" in newspaper and magazines having general circulations in the community, visited schools, universities, employment offices, and other known sources of minority applicants.

The company is in the wood processing business and manufactures plywood, particleboard, chemical resins and compounds and variable dimension lumber. The basic wood utilized in the various processes (other than chemical) is Southern Pine. Therefore, the plants are located in rural Mississippi to be near this raw material. These rural areas were primarily agriculturally oriented prior to the company's arrival. Therefore, there were limited numbers of persons having previous industrial experience. This was particularly true of skilled and supervisory personnel and those who were available in the areas as the new plants opened who possessed experience in the skilled trades or had previous supervisory experience were virtually all white.

The company solved this problem in several ways. First, it imported or transferred skilled and supervisory personnel from other plants, primarily from the Pacific Northwest where the company owned and operated plywood and other wood product plants. Second, it hired skilled maintenance personnel from the construction crews which built the plants. Third, it recruited and hired experienced skilled and supervisory personnel from in and around Mississippi; and fourth, it trained and promoted employees who were hired into the non-skilled and non-supervisory hourly ranks because they did not possess the necessary skills and experience at time of original hire.

The company was unable to locate and hire many experienced black persons for its skilled maintenance and supervisory positions as it opened and operated its plants. The evidence reflects, however, that several maintenance personnel were employed by

the company when the plants at Taylorsville and Bay Springs were opened. Therefore, it has been necessary, in order to place blacks into these positions for the company to seek out and train hourly employees. The company has utilized both on-the-job training and formal training programs in the plants as well as providing financial assistance for employees to attend vocational training centers to learn skilled jobs. These efforts have resulted in the promotion of numerous black hourly employees to skilled and supervisory positions. Offers have been made to other black employees for promotion to maintenance and supervisory positions and black employees are regularly consulted by management concerning the identity of black employees who have the skills or desire to promote to such positions.

Moreover, black employees hold the highest paying hourly positions in virtually all the plants involved in this litigation. Thus black employees have been able to successfully compete for these higher paying positions and have not been excluded therefrom by any artificial barriers.

The company also employs blacks at each of its locations in percentages which equal or exceed the availability of blacks in the workforce in the areas from which it hires its employees.

The company, through its personnel representatives has been active in establishing programs to assist black colleges in curriculum development in an effort to assist in better preparing the graduates of these colleges for careers in management after graduation.

Georgia-Pacific's exhibits reflect or summarize all openings which occurred over a period of time, seniority dates of applicants, experience and qualifications of applicants, the identity of the successful applicant, the identity of unsuccessful applicants, and other relevant data. These exhibits clearly reflect that black employees have not been excluded from any positions, including the company's skilled, supervisory and laboratory positions. These exhibits also reflect that in instances where white employees were awarded positions over black employees, that the white employees were better qualified by prior job related experience or had more seniority.

The EEOC presented the claims and testimony of 5 of the 8 persons who had filed charges that are involved in the action sub judice. These are Edward Ray Barnes, Q. C. Jones, Carlos Marshall, Hubert Nicholson and Elmyra Peyton. As has been noted hereinbefore, the EEOC in its administrative determinations found no reasonable cause to sustain the charges of any of the charging parties, except Elmyra Peyton.

*Elmyra Peyton.* Ms. Peyton's testimony was in direct conflict with that of the plant superintendent and secretary at the Bay Springs chip-n-saw mill where she was employed. In her charging affidavit, Ms. Peyton stated that persons of the black race, including herself, had been fired because of race.

The incident which triggered the charge involved a certificate of her physician as to an illness during a period when she was absent from work. The record reflects that on or about July 5, 1974, she asked to be excused from work because of illness. She presented a note from her physician which stated that she was to return to work July 8. The supervisor refused to excuse her and discharged her because of her absence. The physician's name was stamped but not written on the note. Stamped medical excuses were not acceptable to the company and Ms. Peyton had been given notice of the position of the company in this regard. She was given an opportunity to secure a signed excuse before her termination, but chose not to do so. The plant superintendent testified that when Ms. Peyton left the mill premises she was accompanied by a man and they were traveling in a direction away from instead of going toward her home as she testified she did. The record reflects that while approximately 80% of employees under the supervision of Ms. Peyton's supervisor were black, the record also shows that Ms. Peyton testified that the department on her shift was approximately all black. The court concludes that

the percentage of blacks discharged by the supervisor was at a lesser rate than their representation in that department and shift.

*Hubert Nicholson.* The evidence does not sustain the charge of Mr. Nicholson that Georgia-Pacific discriminated against him or other members of his race in promotions, assignments and hirings at its Louisville Particleboard plant. The testimony reflects that Mr. Nicholson requested a transfer to Mechanic Trainee position on November 20, 1973, and again on May 24, 1974. There were no openings in this position on either date. At a later date in 1976, a vacancy in this position was filled by an applicant with more seniority than Mr. Nicholson.

*Carlos Marshall.* Mr. Marshall's charge filed with EEOC stated that he was discharged by Georgia-Pacific at its Taylorsville Particleboard plant because of his race and that the company discriminated against blacks with respect to hiring, job classifications and work assignments. The evidence does not sustain the charge that Mr. Marshall was subjected to any discriminatory employment practices on account of race.

*Edward Ray Barnes.* Mr. Barnes claimed in his charge filed with EEOC that he was discharged by Georgia-Pacific at its Taylorsville plywood plant because of his race. The testimony shows that he was discharged when caught sleeping on the job, and that like treatment had been given to white employees under similar conditions. The court concludes that Georgia-Pacific did not discriminate against Mr. Barnes because of his race, and that his charges have not been sustained by the evidence presented to the court.

*Q. C. Jones.* Mr. Jones complained to the EEOC that Georgia-Pacific had discharged him from his employment at Georgia-Pacific's Taylorsville plywood plant because of his race (black) and that he was not afforded workmen compensation benefits because of his race. The testimony introduced and documents received in evidence are not sufficient to support the contention of Mr. Jones.

*Edward L. Nix, Daniel Pittman, Jr., and Fabieus Robinson.* The evidence in the case does not support the claims of these charging parties, who did not appear as witnesses at the trial.

### Conclusions of Law

Georgia-Pacific, on April 10, 1975, filed a motion to dismiss with respect to the employment practices at its Bay Springs and Louisville plants on the ground that the EEOC had failed to meet and satisfy the jurisdictional prerequisites required by Section 2000e–5(b) of the Act, 42 U.S.C.A. § 2000e–5(b) and its own procedural regulations published at 29 C.F.R. § 1601.23. The response of EEOC stated that it had under investigation, pending at the time, charges of employment discrimination filed against Georgia-Pacific's Bay Springs and Louisville plants. There had been no determination made by EEOC and no effort had been made to conciliate the matter. EEOC cited the refusal of Georgia-Pacific to cooperate with the commission in its efforts to investigate the charges. EEOC contended that the motion should be overruled and EEOC should be allowed to proceed with respects to the Bay Springs and Louisville operations for such a course would void duplicitous actions and allow the action sub judice to resolve all questions with regard to discriminatory employment practices at all of Georgia-Pacific's Mississippi facilities at one time. The motion was overruled and the action proceeded to a final hearing with respects to all of Georgia-Pacific's facilities at Bay Springs, Gloster, Taylorsville and Louisville.

Georgia-Pacific has incorporated in its proposed findings of fact and conclusions of law a finding that the action should be dismissed for failure of EEOC to meet the jurisdictional requirements of 42 U.S.C.A. § 2000e–5(f)(1), with respect to the forestry and chemical operations, the plants at Bay Springs and Louisville and the plywood plant at Gloster. The testimony shows that no charges have been made at any time with respect to either the forestry operations or the chemical plants at all locations.

The only charge (Hubert W. Nicholson) filed with respect to the Louisville particleboard plant was filed December 5, 1974, after this action was filed by EEOC, on November 7, 1974. There has been no charge filed against the plywood plant at Louisville. The charge (Elmyra Peyton) against the Bay Springs saw mill was filed November 5, 1974, two days before the filing of this action. The charge of Fabieus Robinson, Jr. with respect to the plywood plant at Gloster was not timely filed.

■ Georgia-Pacific, contends that EEOC is without authority to institute the action sub judice with respects to the plants just mentioned because the charges had not been taken through the administrative process required by 42 U.S.C.A. § 2000e–5(f)(1), citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Equal Emp. Op. Com'n v. Louisville and Nashville R. Co.,* 505 F.2d 610, 616 (5th Cir. 1974), *reh. den.* 508 F.2d 842 (5th Cir. 1975); *EEOC v. Raymond Metal Products Company,* 530 F.2d 590, 592 (4th Cir. 1976). In *Raymond Metal Products, supra* the court said:

> After an aggrieved person or a member of the commission has filed a charge against an employer or a labor organization alleging an unfair employment practice, Title VII requires the commission to complete a four-step procedure before commencing judicial action. These steps are service of a notice of the charge, investigation, determination of whether there is reasonable cause to believe the charge is true, and endeavors to eliminate the alleged unlawful practice through conference, conciliation, and persuasion. The commission can institute suit only if it has been unable to secure an acceptable conciliation agreement.

530 F.2d at 592. (footnotes omitted)

The position of Georgia-Pacific would undoubtedly be correct if each charge is considered in isolation. A different picture is presented, however, where there exists a single industry with operations at separate locations, but all subject to one source of supervision and control. The court's action on the motion to dismiss was dictated in reliance upon the well-known and generally accepted rule announced by the Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), where the late Mr. Justice Black, speaking for an unanimous court, said:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

355 U.S. at 45, 78 S.Ct. at 102, 2 L.Ed.2d at 84. (footnote omitted)

The parties have labored long and well to adequately present this case to the court. The trial was lengthy and expensive for everyone, in time and money. All issues have been thoroughly explored. It would be unwise and wasteful of judicial effort for the court to give further consideration to the issue thus presented. The court's duty is to proceed to decide the issues properly presented by the record.

■ The initial burden rests with the EEOC to prove by a preponderance of the evidence that Georgia-Pacific has intentionally engaged in or is intentionally engaging in an unlawful employment practice. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396, 416 (1977) (hereafter "Teamsters"); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668, 677 (1973); *United States v. Jacksonville Terminal Company,* 451 F.2d 418, 443 (5th Cir. 1971), *cert. den.* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); *Hodgson v. First Fed. Sav. and L. Ass'n of Broward Co., Fla.,* 455 F.2d 818, 822 (5th Cir. 1972).

■ When racial discrimination in employment practices is alleged, the plaintiff must first establish a prima facie case of discrimination before the burden of producing evidence shifts to defendant.

■ Once plaintiff has established a prima facie case, the burden then shifts to

defendant to prove legitimate, non-discriminatory reasons for his actions by a preponderance of the evidence. Upon proper proof of a legitimate reason for the employer's action, plaintiff then bears the burden of proving by a preponderance of the evidence that the articulated reasons are a pretext for racial discrimination. *Teamsters, supra; McDonnell Douglas, supra; Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1255 (5th Cir. 1977).

The burden in the action sub judice rested initially upon EEOC to prove by a preponderance of the evidence that Georgia-Pacific has intentionally engaged in or is intentionally engaging in a practice or pattern of racial discrimination with respect to its employees in hiring, assignment, promotion, discharges and the infliction of penalties for infraction of company rules. To meet this burden EEOC introduced statistical evidence as well as testimony from individuals.

█ It is "unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role', . ..'' *Teamsters, supra,* 431 U.S. at 339, 97 S.Ct. at 1856, 52 L.Ed.2d at 417. Where statistics are received in evidence the court will listen. Statistics are often sufficient within themselves, to make a prima facie case of discrimination. *Teamsters, supra,* 431 U.S. at 337, 97 S.Ct. at 1855, 52 L.Ed.2d at 417; *James v. Stockham Valves and Fittings Co.,* 559 F.2d 310, 328–9 (5th Cir. 1977) *rev'g* 394 F.Supp. 434 (N.D.Ala.1975); *Wade v. Mississippi Cooperative Extension Serv.,* 528 F.2d 508, 516–17 (5th Cir. 1976).

The EEOC and Georgia-Pacific have introduced statistical evidence which covers a period of time beginning in 1971 and extending to within a few days of the trial. Individuals have testified who were or are employees of Georgia-Pacific at most, if not all, of the plants involved.

Georgia-Pacific produced witnesses from its managerial and supervisory staffs from each location; also, other employees. A discussion of the evidence in detail is unnecessary and would unduly prolong this memorandum.

There are instances where the statistics reflect an under-representation of blacks in Georgia-Pacific's overall workforce, i. e., the following categories: (1) plant management (2) office personnel (3) clerical help (4) mechanical maintenance (5) electrical maintenance (6) supervisory positions, (7) chemical plant personnel and (8) forestry salaried employees.

Applying the above findings of fact and conclusions of law, the court finds:

1. That Georgia-Pacific did not discharge Elmyra Peyton from its Bay Springs saw mill because of her race or color; that she voluntarily terminated her employment with Georgia-Pacific on July 5, 1974; that no violation of 42 U.S.C.A. § 2000e, et seq. was committed by Georgia-Pacific in regard to Elmyra Peyton;

2. That Fabieus Robinson, Jr. was not discharged by Georgia-Pacific from its Gloster Plywood plant because of his race or color, nor was he refused employment because of his race or color;

3. That Georgia-Pacific did not fail or refuse to hire Daniel Pittman, Jr., at its Taylorsville plywood or particleboard plants because of his race or color;

4. That Carlos Marshall was not discharged from the Taylorsville particleboard plant of Georgia-Pacific because of his race or color;

5. That Edward Ray Barnes was discharged from the Taylorsville plywood plant of Georgia-Pacific on April 18, 1972, because he was found sleeping on the job and not because of his race or color;

6. That Q. C. Jones was discharged from Georgia-Pacific's Taylorsville plywood plant on January 3, 1973, because he was absent from work without calling in, that he was not discharged because of his race or color; that Jones was not denied workmen's compensation benefits because of his race or color;

7. That Edward L. Nix made application for employment with Georgia-Pacific at its Taylorsville operation on October 27, 1972, and was not hired; but this failure to hire Nix was not because of his race or color;

8. That Hubert Nicholson was not denied a maintenance position at Georgia-Pacific's particleboard plant at Louisville, because of his race or color; that no vacancies occurred for such position between the time Nicholson made his application and the date of the determination by EEOC, December 1, 1975;

9. That the statistical evidence does not reflect a disparity between the percentage of blacks hired and the percentage of blacks in the relevant available workforce at any of Georgia-Pacific's operation; *Robinson v. Union Carbide Corp., Materials Systems Div.*, 380 F.Supp. 731, 743 (S.D.Ala.1974); citing *United States v. Jacksonville Terminal Co., Inc., supra* ; that the evidence as a whole does not establish that Georgia-Pacific has failed or refused to hire black persons because of their race or color;

10. That the statistics received in evidence do not reflect that black employees have been assigned to lower paying or less desirable job classification because of their race or color; that the evidence as a whole does not show that Georgia-Pacific has assigned employees to lower paying or less desirable job classifications because of their race or color;

11. That the statistics received in evidence in this action do not reflect that black employees have been refused promotion or have been denied the opportunity for promotions to higher paying or more desirable job classifications because of their race or color; that the evidence as a whole does not show that Georgia-Pacific has failed or refused to promote black employees or has failed or refused to give black employees the opportunities for promotions to higher paying or more desirable job classifications because of their race or color; .

12. That neither the statistics presented in this action nor the evidence as a whole reflect that Georgia-Pacific has discharged black employees from their employment because of their race or color;

13. That the statistics presented in this action do not reflect that black employees were paid lower wages or other forms of compensation than were white employees because of the black employees' race or color; that the evidence as a whole does not show that black employees were paid lower wages or other forms of compensation than white employees because of the black employees' race or color;

14. That the statistics presented in this action do not reflect that a policy or practice of discharging employees due to garnishment has a disproportionate effect on black employees, as a group, or that such a policy or practice is unlawful under 42 U.S. C.A. § 2000e, et seq.; that the evidence as a whole does not show that Georgia-Pacific maintained a policy or practice of discharging employees due to garnishment at any time material or relevant to this action;

15. That the statistics presented in this action do not reflect that Georgia-Pacific has maintained separate lines of seniority for black and white employees at its operations. The statistics do not reflect that any employee was discriminated against as to his or her seniority and its attendant rights and privileges because of his or her race or color. The statistics presented do not reflect that any employee was deprived or denied training or any other favorable term or condition of employment or the opportunity for training or any other favorable term or condition of employment because of his or her race or color; that the evidence as a whole does not show that any employee was denied any seniority with its attendant rights and privileges because of the employee's race or color nor was any employee denied or deprived of any training or any other favorable term or condition of employment or the opportunity for training or any other favorable term of condition of employment because of the employee's race or color; that the evidence does not show that Georgia-Pacific has maintained separate lines of seniority at its operations because of the race or color of its employees;

16. That the statistics presented in this suit do not reflect that any employee was discriminated against because that employee either opposed an employment practice made unlawful by 42 U.S.C.A. § 2000e et seq. or because that employee filed a

charge, testified, assisted or participated in an investigation, proceeding or hearing under 42 U.S.C.A. §§ 2000e et seq.; that the evidence as a whole does not show that Georgia-Pacific discriminated against any employee because that employee either opposed an employment practice made unlawful by 42 U.S.C.A. §§ 2000e et seq., or because that employee filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under 42 U.S.C.A. §§ 2000e et seq.; and

17. That the court, after reviewing the evidence as a whole, concludes that the plaintiff has failed to show, by a preponderance of the evidence, that Georgia-Pacific has engaged in employment practices in violation of 42 U.S.C.A. §§ 2000e et seq.

Georgia-Pacific proposes a finding of fact that it is entitled to recover a reasonable attorneys fee for defending the action sub judice pursuant to 42 U.S.C.A. § 2000e–5(k), which provides:

> (k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

Georgia-Pacific supports its request with the following cases: *Van Hoomissen v. Xerox Corp.,* 503 F.2d 1131 (9th Cir. 1974); *United States Steel Corp. v. United States,* 519 F.2d 359, 362 (3rd Cir. 1975); *EEOC v. C & D Sportswear Corp.,* 398 F.Supp. 300 (M.D.Ga.1975).

Attorney fees, if allowable, are taxed as costs under the statute. In each of the cited cases, the court found extreme conditions to exist. Chief Judge Elliott of the Middle District of Georgia, in *C & D Sportswear Corp., supra,* based the award of attorney's fee on a finding that the suit was not necessary to protect any substantial public interest. Judge Elliott said:

> The court makes no determination with regard to whether this litigation was instituted by the Commission in bad faith, not finding it necessary to do so. What

the Court does determine is that this was clearly not necessary litigation dictated by any substantial public interest. In this case the Commission sued to redress an alleged unlawful employment practice which occurred more than five and one-half years prior to the institution of suit, and the alleged practice was not a "systemic" one which affected a number of employees nor was it one of a series of alleged unlawful employment practices. Instead, it affected only one individual who, having been given notice of her right to sue years ago, nevertheless failed to pursue it.

398 F.Supp. at 307.

The court does not find that the action sub judice comes within the ambit of cases such as described by Judge Elliott.

The Ninth Circuit case of *Van Hoomissen, supra,* involved the allowance of an attorney fee against EEOC after it had been allowed to intervene in Van Hoomissen's private suit against Xerox. In its intervention complaint, EEOC alleged that Xerox both engaged in discriminatory hiring practices and had unlawfully retaliated against Van Hoomissen. The district court granted leave to intervene, limited to the issue of retaliation. The appeal of EEOC was dismissed by the Ninth Circuit in *Van Hoomissen v. Xerox Corp.,* 497 F.2d 180 (9th Cir. 1974). Xerox then petitioned the Ninth Circuit for an award of attorney's fees as part of its costs on appeal, pursuant to Section 706(k) of the Act. [42 U.S.C.A. § 2000e–5(k).] The court held in effect that the section, on its face, authorized an award of attorney's fees against the Commission, which could be exercised in the discretion of the court. An attorney's fee was awarded. To the court's unpublished order denying rehearing en banc, filed November 6, 1974, contained the statement that "[t]he court in allowing attorney's fees was mindful that the appeal by EEOC was vexatious and prosecuted on highly questionable grounds." *See, United States Steel Corporation v. United States, supra,* at page 364, footnote 23.

The Third Circuit in *United States Steel Corporation v. United States, supra,* was confronted with two principal questions. First, is the award of attorney's fees authorized against the EEOC in a proceeding under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. (1974). Second, assuming that such an award is permitted, what is the standard for imposing or denying the award.

The Third Circuit followed the reasoning of the Ninth Circuit in *Van Hoomissen* and held that "accepting the straightforward meaning of Section 706(k), a court may award an attorney's fee to a private party that prevails against EEOC in a proceeding." 519 F.2d at 362. (footnote omitted)

The district court in *United States Steel* denied the award of an attorney's fee against EEOC. The Third Circuit affirmed the district court's decision. The court said:

A prevailing defendant seeking an attorney's fee does not appear before the court cloaked in a mantle of public interest. In contrast to the advantage to the public that inheres in a successful attack against discriminatory practices, as in *Piggy Park [Newman v. Piggy Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)]* one cannot say as a general rule that substantial public policies are furthered by a successful defense against a charge of discrimination. Instead, a defendant seeking a counsel fee under Section 706(k) must rely on different equitable considerations. A factor frequently considered in awarding an attorney's fee is the proper conduct of a plaintiff. The standard of improper conduct, it would seem, would apply against the EEOC much as it would against a private party. Where a court finds that a proceeding was maintained in bad faith, imposition of a counsel fee against a government plaintiff may be appropriate.

\* \* \* \* \* \*

Here the district court concluded that the Commission undertook "a bona fide effort to seek information." The indicia associated with the grant of an attorney's

fee—vexatiousness, bad faith, abusive conduct, or an attempt to harass or embarrass—were absent. We do not find the district court's formulation of the standard to be erroneous. Rather, its decision not to award counsel fees is indicated by its findings.

519 F.2d at 364. (footnotes omitted)

The court concludes that the proper rule with regard to the allowance of an attorney's fee as an item of costs to a prevailing defendant when sued by EEOC under Title VII, is expressed by the Third Circuit in *United States Steel, supra.*

When the rule is applied to the facts in the action sub judice, the court finds that Georgia-Pacific is not entitled to an award of attorney's fee as an item of costs.

■■■■ The record does not justify a holding that EEOC proceeded against Georgia-Pacific in bad faith, or that vexatiousness, abusive conduct, or an attempt to harass or embarrass were present in the proceedings instituted against Georgia-Pacific by EEOC. Charged with the duty of eliminating racial discrimination in private employment, the court has concluded that EEOC should not be held to the same standard as applied in cases where a victim must bring an action to curtail or eliminate racial discrimination. Only in cases where the proceeding is instituted in bad faith, without reasonable grounds, or to harass or embarrass the responding party, is the court justified in making such an award. The facts in the action sub judice do not bring EEOC within this holding. The request for the allowance of an attorney fee will be disallowed.

An order on the attorney fee issue will be entered by the court and the clerk with enter the final judgment dismissing the complaint on the merits at plaintiffs' costs.